# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **OMAR STEELE**, | * | |
| | * | |
| *Petitioner* | * | |
| | * | |
| v. | * | Civil Action No. RWT-16-2713 |
| | * | (Related Criminal Case No. RWT 12-0014) |
| **UNITED STATES OF AMERICA**, | * | |
| | * | |
| *Respondent* | * | |
| | *** | |

## MEMORANDUM OPINION

Advocacy does not begin and end with a trial. Throughout all stages of litigation, attorneys must vigorously advocate for their clients in spite of busy schedules, personality conflicts, or unforeseen circumstances. In particular, attorneys advocating for criminal defendants who face tough odds at trial must tell their clients what they *need to hear*—not necessarily what they *want to hear*. This sentiment is not merely an aspiration of the judicial system; it is a guarantee under our Constitution.

> The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding. Its protections are not designed simply to protect the trial, even though counsel's absence in these stages may derogate from the accused's right to a fair trial. The constitutional guarantee applies to pretrial critical stages that are part of the whole course of a criminal proceeding, a proceeding in which *defendants cannot be presumed to make critical decisions without counsel's advice*.

*Lafler v. Cooper*, 566 U.S. 156, 165 (2012) (internal quotations omitted) (emphasis added); *see also Missouri v. Frye*, 566 U.S. 134 (2012). Given that "[m]ore than 90 percent of [federal criminal] defendants plead guilty rather than go to trial," it is clear that the criticality of pre-trial

advocacy reaches its zenith during plea negotiations.[1] The instant case involves a fundamental breakdown of an attorney's duties to her client during the plea bargaining process.

I.      **Procedural History**

After a four-week jury trial, Petitioner Omar Steele ("Steele") was found guilty on April 19, 2013 of one count of conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846; one count of maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1); one count of interstate travel to promote unlawful activity in violation of 18 U.S.C. § 1952; one count of possession with intent to distribute controlled substances in violation of 18 U.S.C. § 841; and three counts of using a communications device to facilitate narcotics trafficking in violation of 21 U.S.C. § 843(b).  *See* ECF Nos. 308, 413, 522.  On August 27, 2013, Steele was sentenced to 192 months imprisonment followed by five years of supervised release.  *See* ECF Nos. 507, 522.  On April 24, 2015, the Fourth Circuit affirmed Steele's conviction and rejected his challenge to the extensive wiretap evidence used against him.  *See* ECF Nos. 580, 583.  This Court later lowered Steele's sentence of imprisonment to 188 months based on a retroactive amendment to the United States Sentencing Guidelines ("U.S.S.G.").  *See* ECF No. 637.

On July 27, 2016, Steele filed a motion under 28 U.S.C. § 2255 ("§ 2255 Motion") to vacate, set aside, or correct his sentence.  *See* ECF No. 625.  The § 2255 Motion was fully briefed, *see* ECF Nos. 625, 644, 648, and on June 22, 2017, the Court denied Steele's Motion in-part, while appointing him counsel for an evidentiary hearing regarding the remaining "factual issues relating to the performance by [Steele's] trial counsel in the plea negotiation process," *see* ECF Nos. 652, 653.  The Court conducted an evidentiary hearing on January 4, 2018.  *See*

---

[1] *Criminal Cases*, United States Courts, http://www.uscourts.gov/about-federal-courts/types-cases/criminal-cases (last visited July 16, 2018).

ECF Nos. 683, 688. At the Court's direction, Steele provided a post-hearing brief in support of his § 2255 Motion, *see* ECF No. 691, the Government responded in opposition, *see* ECF No. 694, and Steele replied in support of his Motion, *see* ECF No. 698.

**II.     Discussion**

***Legal Standard.***  As previously noted, the Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler*, 566 U.S. at 162. "Even if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." *Id.* at 166. As with other claims of ineffective assistance of counsel, courts examine constitutional flaws in the plea bargaining process under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). *See id.* at 162–63.

Under the performance prong, a defendant must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. "Judicial scrutiny of counsel's performance must be highly deferential," and the Court must evaluate the conduct at issue from counsel's perspective at the time, and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004).

Under the prejudice prong, a defendant must show that the deficient performance prejudiced the defense, and but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687, 694. In the factual context of plea negotiations where a plea offer has not been communicated to a defendant, in order to "show prejudice from ineffective assistance of counsel . . . defendants must demonstrate a reasonable probability that they would have accepted

3

the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 133, 147 (2012). "Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it." *Id.*

*The Key Letters.* Prior to the evidentiary hearing, two primary artifacts of evidence supported the plausibility of Steele's allegations of counsel's deficient performance. The first was a November 2, 2012 letter from Steele to his trial counsel, Kira West ("West"), in which Steele (1) indicated that he had sent "numerous letters" to which West had not responded, and (2) vehemently expressed a desire to obtain a plea agreement from the Government in order to plead guilty. *See* ECF No. 648-3. The second was West's November 29, 2012 response letter, which she drafted after meeting with the Government the day before. *See* ECF No. 648-4. While West advised Steele that no plea offer had been made by the Government, based on her discussions with the Government, she outlined the sort of plea agreement she believed she could obtain (based on an Offense Level of 30, resulting in a sentence of imprisonment of 97–121 months, and the possibility of a reduction of 2–4 levels for cooperation)—a case resolution that would have resulted in approximately half of the length of imprisonment that Steele ultimately received. *See* ECF No. 648-4.[2] Despite this meeting occurring after eight of Steele's ten co-defendants had accepted plea agreements,[3] West concluded her correspondence by dissuading Steele from taking such a plea offer because the Government would not be "giving you much" and opining that Steele "[did not] have to make a decision soon." *See id.*

---

[2] The nature of the meeting and the substance of West's calculations are corroborated by the handwritten notes of AUSA Deborah Johnston (now deceased) concerning their November 28, 2012 meeting—a document that the Government made available subsequent to the evidentiary hearing following a review of Johnston's file notes. *See* ECF No. 696. While not a written, formal agreement, the documentation from each side supports the contention that there was effectively an outline of the parameters that such an agreement would involve, i.e., a sentence of 97–121 months.

[3] *See infra* Note 12.

4

***The Testimony.*** At the evidentiary hearing, the Court heard testimony from both Steele and West. After weighing the credibility of each witness and comparing their statements to the other evidence in the record, the Court finds Steele's testimony to be credible. The Court also finds West's testimony both contradictory and incredible.[4] West had a busy client schedule and

---

[4] It is fairly common for defendants to raise claims of ineffective assistance of counsel in post-conviction habeas petitions. However, West's reaction to Steele's petition was anything but common. The Government never sought, and West was never compelled by, any Court Order requiring disclosure of client information. *See generally Butler v. United States*, No. DKC 12-cr-0116, 2016 WL 1427090 (D. Md. Apr. 12, 2016) (compelling trial counsel's disclosure of only that information that was "reasonably necessary" to the § 2255 proceedings, while also imposing limitations on its use, following the guidance of *United States v. Nicholson*, 611 F.3d 191 (4th. Cir 2010), and ABA Comm. On Ethics & Prof'l Responsibility, Formal Op. 10-456 (2010) (hereinafter "ABA Formal Op. 10-456")).

However, in anticipation and furtherance of the evidentiary hearing, West shared evidence with the Government without her client's consent and sent repeated letters in an attempt to discredit Steele and vindicate her prior performance. *See, e.g.*, ECF No. 693-1 (West's letter to defense counsel); Sealed Ex. A to this Opinion (West's letter to the Court); Sealed Ex. B to this Opinion (West's letter to the Government). The Court is deeply concerned by West's actions, and that concern is amplified by a formal opinion of the American Bar Association's Standing Committee on Ethics and Professional Responsibility:

> Although it is highly unusual for a trial lawyer accused of providing ineffective representation to assist the prosecution in advance of testifying or otherwise submitting evidence in a judicial proceeding, sometimes trial lawyers have done so, and commentators have expressed concerns about the practice. In general, a lawyer must maintain confidentiality of information protected by Rule 1.6 for former clients . . . and may not disclose protected information unless the . . . former client gives informed consent. The confidentiality rule applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source.

*See* ABA Formal Op. 10-456 at 1 (discussing the disclosure of information to prosecutors when the attorney's former client brings an ineffective assistance of counsel claim) (internal quotations omitted).

While West claims that she "had to give this information" to the Government by virtue of Steele's § 2255 petition, *see* ECF No. 688 at 140–46, she is plainly incorrect. An attorney's "self-defense exception" does not apply here because "the legal controversy is not between the client and the lawyer," and "the habeas corpus petition is not a criminal charge or civil claim against which the lawyer must defend." *See* ABA Formal Op. 10-456 at 3–4. Even if West were mistaken on this issue, the information she provided was both (1) nonessential and (2) made without appropriate measures to protect access to a wide breadth of her client's information. *See id.* at 4–5.

> In the generation since *Strickland*, the normal practice has been that trial lawyers do not disclose client confidences to the prosecution outside of court-supervised proceedings. There is no published evidence establishing that court resolutions have been prejudiced when the prosecution has not received counsel's information outside the proceeding. Thus, it will be extremely difficult for defense counsel to conclude that there is a reasonable need in self-defense to disclose client confidences to the prosecutor outside any court-supervised setting.

*See id.* at 5. Therefore, the Court concludes that West's actions may have been in violation of the duty of confidentiality and the attorney-client privilege, and they color West's subsequent testimony as impetuous and self-serving.

frequently neglected personal communication with Steele.[5] When she did communicate with Steele, it often took place through a go-between (an individual whom Steele referred to as an "intern," and whom West referred to as a "law clerk" allegedly barred in some jurisdiction).[6]

West was overly confident in her ability to secure an acquittal based on her prior experience and claimed success rate as an AUSA in Texas.[7] She did not accurately manage her client's expectations, and she failed to remediate the obvious deficiencies in her familiarity with this jurisdiction and defense advocacy generally.[8] West's self-professed legal expertise in wiretaps, coupled with Steele's naïveté and lack of legal acumen, contributed to West successfully convincing Steele that a Motion to Suppress Wiretap Communications [ECF No. 224] had an unreasonably high probability of success pre-trial, and the preservation of which was of paramount importance once the Motion was denied.[9] West did not properly advise Steele as to the realities of the sentence he faced or the odds stacked against him. Instead, undeterred by any of these setbacks and the overwhelming evidence against her client, West continued the onward march to trial dragging Steele behind her.[10]

---

[5] For example, in the first ten months of Steele's pre-trial incarceration, West visited Steele in jail on only one occasion. *See* ECF No. 688 at 7–8, 25–26; *but see* ECF No. 688 at 83–84, 118–20 (West averring that she often opted to meet with clients at the courthouse holding cells before and after hearings instead).
[6] *See* ECF No. 688 at 15–17, 24–25, 84–85, 124–25.
[7] *See, e.g.*, ECF No. 688 at 4, 111, 121–23.
[8] Steele argues, and the Court agrees, that the record indicates that West either misunderstood herself or failed to advise Steele of a number of issues which materially affected Steele's decision to move forward with trial. *See* ECF No. 691 at 9–14. West failed to inform Steele of a two-level sentencing enhancement for firearms possessed by co-defendants. *See id.* She also conveyed a number of erroneous beliefs regarding the timing of, and Steele's qualifications for, the safety valve provision in the U.S.S.G. *See id.* West incorrectly advised Steele to not rush in his plea decision, while the other co-defendants were nearing the end of their respective plea negotiations. *See id.* And she misapprehended the availability of conditional pleas in this jurisdiction that might have preserved her unsuccessful challenge to the wiretap evidence for appellate review. *See id.*
[9] *See* ECF No. 688 at 14, 19–20, 23–24, 55–56, 73, 92–93, 98, 121–23.
[10] Despite a plethora of evidence of nearly a thousand recorded contacts between Steele and the main co-defendant facilitating the conspiracy, *see* ECF No. 691 at 10–11 (citing the Government's fact summary on appeal), West repeatedly—and now, unapologetically—advised Steele that his chances at trial were good, *see, e.g.*, ECF No. 688 at 14 (Steele explaining that West viewed the Government's evidence as not "convincing," while the defense "had a strong case going to trial"); ECF No. 688 at 111 (West asserting a lack of evidence against Steele and that the defense "had a better chance than a lot of people that [West] see[s] go to trial with drug evidence"); ECF No. 688 at 123 (West stating "I thought his chances at trial were good. There was very little evidence against him.").

6

It is undisputed that Steele was initially only willing to accept a plea agreement that resulted in less than eight years imprisonment.[11] However, at some point in October or November of 2012, Steele learned that his co-defendants were receiving and agreeing to lenient plea deals.[12] Coincidentally, it was around this time that Steele's willingness to accept a plea agreement changed—from six to eight years—to eight to ten years—to a panicked "I know you [are] not God, but please Kira help me, get me out [of] the way before it is too late."[13] Only after her client's explicit (and documented) begging, West met with the Government to discuss potential plea ranges.[14] However, *even then*, West never discussed a conditional plea that would have retained Steele's right to appeal the denial of the wiretap motion, and she never obtained *any* written plea offer to put in front of Steele despite his heartfelt imploring.[15]

---

[11] *See, e.g.*, ECF No. 691 at 14; ECF No. 694 at 4.
[12] In fact, eight of Steele's ten co-defendants accepted plea agreements. *See* ECF Nos. 158, 177, 233, 242, 249, 273, 285, 354. Facing a U.S.S.G. range of 235–293 months at sentencing, the Court granted Steele a downward variance. However, because Steele's culpability fell in the middle-range of his co-defendants, his 188-month sentence remains in stark contrast to those of his peers.

Pursuant to plea agreements, Steele's co-defendants received sentences with the following periods of incarceration:
- Saul Calderon Mata: 144 months
- Ivan Santoyo-Villa: 78 months
- Alfonso Solorio: 72 months
- Devonte Jackson: 60 months
- Gaudencio Campos Torres: 51 months
- Nelkin E. Rincon-Cubilete: 36 months
- Lorena Chavez-Luna: 24 months
- Daniel Mark Stotz: 6 days

After trial, Steele's co-defendants received sentences with the following periods of incarceration:
- Francisco Barahona: 132 months
- Noe Farid Medrano: 120 months

[13] ECF No. 648-3; *see* ECF No. 688 at 22–34, 43–44.
[14] *See* ECF No. 688 at 95–97.
[15] *See* ECF No. 688 at 98–99.

West's advice to Steele regarding the availability of conditional pleas was simply wrong—both factually and legally.[16] Conditional pleas are permitted so long as the plea agreement complies with the requirements of Fed. R. Crim. P. 11(a)(2) and (in the Fourth Circuit) the judicially-created requirement that "the matter preserved for appeal is *case-dispostivie* and requires no further factual development." *See United States v. Bundy*, 392 F.3d 641, 646 (4th Cir. 2004) (emphasis added).

Indeed, while it is not the norm, this Court has presided over many conditional guilty pleas subject to appeals of case-dispositive motions. *See, e.g.*, *United States v. Morris*, 482 F. App'x 779 (4th Cir. 2012) (reviewing an appeal from a conditional guilty plea at the district court before Titus, J.); *see also United States v. Foster*, 824 F.3d 84 (4th Cir. 2016) (affirming a conviction after a conditional guilty plea); *United States v. Odom*, 721 F. App'x 254 (4th Cir. 2018) (same); *United States v. Bowman*, 884 F.3d 200 (4th Cir. 2018) (vacating a conviction after a conditional guilty plea when finding that a motion to suppress should have been granted by the district court). Sifting through the annals of this Court's criminal docket, the Court can think of no more *case-dispositive* motion than the one presented in the instant case—a motion to suppress the lion's share of the Government's evidence (i.e. the 977 wiretap recordings of Steele's communications in furtherance of the charged criminal conspiracy).

Likewise, the actual sentencing ranges being negotiated by the parties indicate a further fundamental breakdown in advocacy. West now claims that the Government would never have agreed to any term of imprisonment below ten years,[17] but her letter and the Government's notes

---

[16] *See* ECF No. 688 at 92 ("I'm sure that there is no way – I have never heard of a case here in the District of Maryland where you can maintain your – your right to your wiretap motion on appeal and plead guilty."); ECF No. 688 at 98 ("I mean, I don't think I would have asked [the prosecutor] if we could plead guilty and keep the wiretap motion, preserve it for appeal. I probably wouldn't have even asked that because I know what the answer would have been.").

[17] *See* ECF No. 688 at 98–99.

indicate otherwise.[18]  Meanwhile, Steele testified that he informed West's "intern" that he was willing to accept a sentence within the 97–121 months outlined in West's November 29, 2012 letter.[19]  The Court finds Steele's testimony in this regard to be sincere and credible.  However, numbers do not require a credibility determination because they do not lie.  The Court need not find an agency relationship, imputation of knowledge, or even the standards of professional conduct, because this sentencing range in-and-of-itself tells the whole story.  At its lower value, 97 months is merely a hair over eight years—so *even if Steele had never changed his mind to accept a higher range*, the parties were nearly at an agreement.  At its upper value, 121 months is a hair over ten years—so *even if the Government would not have accepted a sentence below ten years*, the parties were nearly at an agreement.  Thus, the Court is left to conclude that "what we've got here is a failure to communicate."  Cool Hand Luke (Warner Bros.-Seven Arts, Inc. 1967).  And it was a tragic and prejudicial failure.

*A Failure to Communicate.*  An attorney's competence and diligence in communication with his or her client are not simply idealistic concepts contained in the Rules of Professional Conduct—they are fundamental to advocacy under the Sixth Amendment.  They apply throughout "the whole course of a criminal proceeding," both during trial and all "pretrial critical stages."  *Lafler*, 566 U.S. at 165.  The record indicates that West not only neglected her obligations to communicate with her client regularly, but also failed to proactively engage in the plea bargaining process with the Government.  Repeatedly, Ms. West acknowledged that her practice is to seek out a plea offer *when her client asks for one*.[20]

As noted above, the role of a criminal defense attorney is to tell clients what they *need to hear*—not necessarily what they *want to hear*.  An attorney's desire to go to trial is an

---

[18] *See supra* Note 2 (and accompanying text).
[19] *See* ECF No. 688 at 32–33.
[20] *See* ECF No. 688 at 95–96, 100, 109–10, 115–16.

9

insufficient substitute for proper representation. Steele's pretrial motions were lost, the evidence mounted against him was overwhelming, *see supra, e.g.*, Note 10, and his leverage was dwindling as eight of his ten co-defendants had accepted plea agreements, *see supra* Note 12. Under these circumstances, a rational and competent advocate would not cling to delusions of victory when hope was slipping away, but rather would have proactively sought out a plea offer and advised his or her client that a plea was likely in the client's best interest.[21] As noted in *Lafler*, a client "cannot be presumed to make critical decisions without counsel's advice," and here, the advice West gave was fundamentally wrong, if given at all. 566 U.S. at 165.

In any event, the facts of this case illustrate an even graver deficiency. Despite all of West's failures to properly advise her client or proactively engage the Government in vitally important plea discussions, Steele—on his own volition—*begged* his attorney to obtain a plea offer for him. And West failed to do so. It does not matter if the range discussed with the Government was slightly different than what the defendant was seeking or if the plea offer omitted some condition that the defendant desired. Sometimes, that is what advocacy is all about—having heartfelt discussions with clients to adequately advise them of their options and realistically prepare them for what lies ahead.

Quite simply, when a criminal defendant asks his or her attorney to obtain a plea offer, and the attorney fails to do so when acquiring one was reasonably practicable, then that attorney has "made [an] error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 689; *cf. Lafler*, 566 U.S. at 165–66. Therefore, Steele has established that West's performance was deficient in her failures to properly advise him throughout the critical pretrial stages, to adequately engage in the plea

---

[21] *But see* ECF No. 688 at 121–23 (West stating *even now*, years after losing at trial, that she thought Steele's chances were "good" despite her never having "won a wiretap case before a jury . . . as a defense attorney" and never having "lost a wiretap trial before a jury . . . as a prosecutor").

10

bargaining process, and to obtain a plea offer when her client pleaded for one and when obtaining one was reasonably practicable. Additionally, the Court finds that Steele has established prejudice because not only would he have accepted a sentencing range of 97–121 months had he been properly advised, but also he tried to accept such a sentencing range through his unsuccessful attempts at communication with West through her "intern."

*Remedy.* Having concluded that Steele has satisfied his burden under *Strickland*, the Court must now determine the appropriate remedy.[22] As guidance, there is some decisional precedent in instances of an attorney's failure to communicate existing plea offers, or plea offers rejected by defendants due to ineffective assistance of counsel. *See, e.g.*, *Frye*, 566 U.S. at 150–51; *Lafler*, 566 U.S. at 174–75 (finding that available remedies may include resentencing). The Government points to the factual differences between the instant case and *Lafler* and *Frye*—namely, the absence of a formal, written plea offer—to assert that Steele is entitled to no relief whatsoever. *See, e.g.*, ECF No. 694 at 9–10.

However, the Government's argument entirely misses the mark. It is true that *Lafler* involved a plea offer rejected by a defendant due to counsel's erroneous advice, 566 U.S. at 161, and *Frye* involved a plea offer never communicated to a defendant, 566 U.S. at 138–39. While these cases are factually different from the instant case, *Lafler* and *Frye* stand for the more fundamental proposition that the plea bargaining process is essential to representation under the Sixth Amendment. It is true that the specific facts of this case do not fit neatly into the fact patterns of these prior Supreme Court cases, but a very grave injustice has befallen Steele.

---

[22] An acquittal is improper because this is not a case involving a claim of actual innocence. On the other hand, a new trial is improper because it would result in prejudice for both Steele (given that a trial is precisely what he was seeking to avoid in his urgent requests for a plea agreement) and the Government (given the duplicative costs and resources with conducting a second trial).

Due to West's deficient performance, Steele is now serving a sentence vastly disparate to his co-defendants that is manifestly unjust considering the comparative culpability of each defendant. There was overwhelming evidence mounted against Steele; eight of his ten co-defendants had already assented to plea agreements; and he desperately sought to enter a plea in exchange for a reduced sentence. The Court has before it the credible testimony of Steele, a letter to him from West [ECF No. 648-4] and posthumous notes made by the prosecutor [ECF No. 696], which establish a clear outline of the parameters for a plea agreement involving Steele—parameters to which Steele assented, and which West did not pursue. All of this amounts to an opportunity lost. With a minimal amount of effort, West could have obtained a formal plea agreement, thus making the circumstances of this case equivalent to an offer not communicated. Therefore, to allow the Government to rely solely on the absence of a written plea offer would shock the conscience of this Court.

Pursuant to the Supreme Court's guidance in *Lafler*, 566 U.S. at 170–72, this Court will remedy the miscarriage of justice at issue in this case by vacating Steele's sentence, and ordering a new sentencing proceeding. A separate Order follows.

Date: July 26, 2018

/s/
ROGER W. TITUS
UNITED STATES DISTRICT JUDGE